## GRANT *v.* LEVAN. ·

Under the act of 1792, unsatisfied warrants passed from hand to hand by endorsement or as bank notes, and an entry of a credit on the account of one making an application for other lands, by a debit to the account kept in the land-office with the holder of such warrants, is no evidence of title or interest in the person entitled to a credit in his account for unsatisfied warrants, and thus debited with the amount of so many of such warrants as were applied to the payment of the new warrants.

Where A. had agreed to take up and patent lands for B. in N. county, in consideration of the assignment of a certain number of unsatisfied warrants, and A. procured warrants and surveys for lands in S. county, which were paid for by a debit to B.'s account on the land-office books for unsatisfied warrants; *held* not to be evidence of title in B. by payment of the purchase money.

And where A. made the following memorandum on the back of a draft of the surveys of the land thus taken up by him: "These lands sold to B. of Philadelphia, deed polls to him; purchase money paid me, (signed) A. The overmeasure to be cast up and accounted for," which draft was retained in his possession, and, many years after his decease, obtained from one of his family without the assent of other members, and possession was not taken under B. for upwards of thirty years; it was held that the endorsement was no greater evidence of title in B. than a verbal admission, to which at such distance of time, and under the circumstances, the statute of frauds was a bar.

Conveyances by the heirs of A., of his lands in N. county, inadmissible for the purpose of showing that A. had obtained the lands there which he had agreed to patent for B., thus raising an inference of title in B. to the lands in S. county.

And so of a sheriff's sale of such lands as the property of A., with proof that his heirs pointed them out for levy and sale.

Where the ancestor dies, pending an ejectment, and the alienee of the heir has been substituted without objection, the conveyance by the heir is proper evidence at the trial.

Defendants in possession may always show the title they claim under, though it may not be the better one.

Where an interested party was offered and admitted to prove the loss of title-deeds, and exception was taken, the record not showing that the testimony was given to the court only, there is error.

VOL. IV.—50

An admission by one during his tenancy, under whom one of the plaintiffs claim, affects such plaintiff only.

Evidence of the purchase of land from those claiming as co-heirs with plaintiffs, only admissible to show a claim of title by plaintiffs in the same right.

Evidence that the creditors of defendants' ancestor levied on all his lands which could be found, not admissible to rebut an inference of title in the ancestor.

Copy of a supersedeas of proceedings in bankruptcy under the act of 1800, certified by the judge of the District Court, with a certificate under the seal of the court that the person so certifying was the judge, inadmissible as evidence.

A certificate of a document from the land-office signed by a clerk for the secretary, under the office seal, is a certificate of the secretary, and evidence under the act of Assembly.

IN error from the Common Pleas of Schuylkill county.

*Jan.* 5, 6, 7, and 8. This was an ejectment for seventeen forty-fourth parts of ten tracts of land in Schuylkill county; the plaintiffs claiming under Robert Martin and his heirs, and the defendants under Robert Morris. The main points of the cause were, whether Martin or Morris had the original title, and whether there was evidence that Martin's title had passed to Morris.

The plaintiffs gave in evidence certified copies of the warrants, dated January 12, 1793, and surveys in May, in the names of Irwine, Weed, Cook *et al.* Also, an office copy of the applications for fifty-three tracts in Berks, Luzerne, Huntingdon and Dauphin, entered January 12, 1793, and proved the applications were all written or signed by Robert Martin, and comprised the lands now in dispute. Upon the envelope was endorsed the following memorandum: "Jan. 12, 1793. Macky, Montgomery, Scotts, Martin, and others—Huntingdon, Dauphin, Berks and Luzerne counties. Mr. Martin to pay." They also gave in evidence the following applications by Martin:

"January 12, 1793, for three tracts in Northumberland county. February 4, for twenty-five tracts in Huntingdon county. February 11, for one tract in Northumberland county. March 13, for twenty-five in same. March 15, for thirty-two tracts in same." On all of which there was the same entry, "Robert Martin to pay."

Also, the old purchase blotter, in which, under date of the 27th March, 1793, is the following entry, in Keble's handwriting.

"10792. Col. Martin, 154 lots.  60,500 a 50s.  £1512 10
1  10 00

155  Amount,  £1522 10

"Cr. By Robert Morris for the amount paid, and interest on the following twenty-five unsatisfied warrants, dated respectively, July 1, 1784, granted in the name of the following persons, John

Stretch," &c. &c., "four hundred acres each, amount of purchase money, £1006 6 8

Interest averaged, 516 12 4

Amount, £1522 19 0

"Fees £77 10, paid by Squire Martin."

In the day-book, as subsequently shown by defendants, the entries were: "March 27, 1793. Sundries, Dr. to land."

The names of the one hundred and thirty-five warrantees each being charged with the purchase money. Then, "Sundries, Dr. to R. Morris, for the following sums paid respectively by them for lands granted on warrants dated July 1, 1784, for four hundred acres each, the same not being vacant as per surveyor-general's certificate dated," (the dates of the certificates proved by plaintiffs,) a list of these followed, commencing with John Stretch, and the total amount was £1522 19.

On the same day, Robert Morris's account current in the ledger of the office, showed he was charged with sundries, £1522 19

Cr. by sundries, 1522 19

These sundries were the ten warrantees for whose land the present suit was brought.

Plaintiffs also gave in evidence a bundle of office papers, filed with the voucher, No. 10792, which were: five certificates dated in February and March, 1793, of the surveyor-general, of unsatisfied warrants; the deeds-poll from all the warrantees mentioned in the voucher, excepting one to Robert Morris; and copies of the warrants. Also an agreement between Morris and Martin, dated March 21, 1793, by which it appeared, that in November, 1779, Robert Morris advanced to Robert Martin the sum of £561 0 5 and that in July, 1784, Morris obtained twenty-five warrants, which Martin agreed to have surveyed, and patented for Morris. For some reason this was never done, and a new arrangement was entered into, by which Morris assigned and transferred to Martin twenty-five unsatisfied warrants, and at the same time paid over to him £250 in specie, making the entire indebtedness of Martin to Morris £2335 10 9, equal to $6201 40. In consideration of this, Martin agreed between that time and the first of the following November, to take up and cause to be surveyed so much good land in the county of Northumberland, as, at one quarter of a dollar per acre, would amount to the sum thus advanced, and to procure and deliver patents for the same.

They further read a deed from Morris and wife to Biddle and Bell, in trust for the Penns. Trust Company, dated the 18th of March,

1797, in the schedule of which was the following: "fifty-three tracts, containing about twenty-five thousand acres, lying in Northumberland county, held by warrant right bought of Robert Martin."

The plaintiffs then proved the pedigree of the heirs of Martin, in whose right they claimed.

After the issuing of the writ, Deborah Grant, one of the plaintiffs, died, and Lewis Dewart had been substituted in her place, alleging he held her title. The court, on the trial, refused to permit the conveyance by George Grant, one of the sons of Deborah, to Dewart, to be read in evidence; it was dated after the suit was brought.

The defendants then called Richard M. Crain, who stated, the papers (produced and mentioned below) are part of what are called voucher No. 10,792. When applications were made in the land-office for warrants, papers like these were made out and sent to the receiver-general's office, who received the money and filed them in his office, numbering them corresponding to the entry in the blotter. The entry in the blotter shows by whom the money was paid, and when there were credits, what those credits were, making a distinction between specie payments and certificates or credits. The blotter does not show the names of the warrantees. The other paper shows their names. The paper shows the names of the warrantees, and the description of the land; nothing more, I believe. The memorandum as to the credits was added to it, after it left the secretary's office. It was made after it left the secretary's office in the receiver-general's office. There it remained and was filed. The receiver-general gave a receipt on the payment of the money, or a certificate of it, and that was brought back to the office of the secretary of the land-office where the warrant is issued, and the lesser seal of the state affixed. That receipt or certificate was kept by the party who paid the money. The warrants bore date, generally, the day the application was filed in the secretary's office, although the money was not paid, and they did not actually issue for a year after. The warrants did not issue until the money and fees were paid. Each office collected its own fees. These papers were prepared by a clerk in the office. The old purchase blotter is in Keble's handwriting, and was kept in the receiver-general's office. They then gave in evidence the application already proved by plaintiff, voucher No. 10792, including these ten warrants, which was (the *paper* alluded to by witness); a copy of the receiver-general's day-book, and the ledger mentioned above, and Robert Morris's account current from the office books. Also, a connected draft of the lands, dated May 31, 1832.

They then proved a judgment against Morris, recovered in 1797, with the *sci. fa.* execution, &c. thereon; plaintiffs objecting that the lien was gone; that Morris had no title; that the *test. fi. fa.* was irregularly issued and was not evidence; that it was irrelevant. Under like objections, they proved the *test. fi. fa.* and sheriff's deed dated July 18, 1831, to William Rawle, and a deed from William Rawle, jun. and wife, dated February 15, 1837, with consent of George Grant and William Laird, to three of defendants; also, under objection, the will of Morris and of his widow, whereby Morris's title was vested in Mrs. Nixon, and a release from Mr. Nixon and wife, dated February 14, 1837, to William Rawle.

Under exception, they also proved an agreement in December, 1830, between Nixon and wife, W. Rawle and W. Rawle, jun., whereby it was agreed, for a valuable consideration therein mentioned, that George Grant should have one-twentieth, and Grant and Laird one-third of nineteen-twentieths of the land.

And (under exception) a mortgage by George Grant, in 1832; a *sci. fa.* and sheriff's sale to one of the defendants, and a conveyance by William Laird to the same.

They then, for the purpose of showing "that Martin applied to Morris to advance the money to take up these lands, (the hundred and fifty-five warrants applied for in the office,) and that Martin was embarrassed, and had no money," gave in evidence, under exception, a note from Martin to Morris, dated February 27, 1793, wherein Martin proposed that if Morris would please to relinquish the contract made in 1784, and let Martin have the benefit of the old warrants, he would patent as much land at 1 10½ per acre as would amount to the principal and interest of the money Morris had advanced; he hoped if the terms were rejected, that Morris would not suppose they were made with a dishonest intention, but from embarrassed circumstances.

Also (under exception) a copy of another proposition by Martin to Morris, dated March 14, 1793, wherein Martin offered if Morris would pay the purchase money for sixty thousand acres in the old purchase, Martin would patent for him as much land as would amount to the money advanced, and the old debt at 1 10½ per acre.

Also (under exception) an endorsement in the handwriting of Martin, on a draft of the lands in question as follows:

"These lands sold to Robert Morris, Esq., of Philadelphia. Deed polls to him; purchase money paid me.     ROBERT MARTIN.

"The over measure to be cast up and accounted for."

2 L

Also a conveyance by several of the heirs of Robert Martin to William Grant, for part of the land not claimed in this suit.

Also under objection, a judgment and execution at the suit of George Grant *v.* The Administrators of Robert Martin in Northumberland county, and that one of the defendants there gave up the lands in that county warranted to Gordon Biddle et al., to be sold for the purpose of making title, and that this was done, and sales effected; part of the money remained unpaid in consequence of Morris's heirs bringing ejectments. A certified copy of a draft of these eighteen tracts was also proved. These lands had been taken up by Robert Martin.

Defendants having read a notice to produce deeds-poll from the warrantees of the ten tracts, called William Rawle, defendant objecting as improper and irrelevant. Witness stated, "that on the 3d of June, 1845, he had searched for the deeds-poll, relating to the ten tracts, through a trunk in the possession of Morris's daughter, containing papers relating to said estate. The search was careful and minute, and none were found. The trunk contained all the papers relating to the estate, as he understood from Mrs. Nixon, the daughter of Mr. Morris." Witness knew of no other papers, but had heard of a trunk in Wayne county, but could not ascertain where it was. The last person in whose possession it was heard of being dead, to which testimony exception was taken.

Defendants then, under objection, gave in evidence the assessments from 1832 to 1838, to show continual claim by defendants, and non-claim by plaintiffs, and showed the deeds to the respective defendants from the purchasers of Morris's title.

Plaintiffs then called George Grant, who testified, "I found this draft among my father's papers in a trunk, (the draft, with the endorsement on it, and the trees,) in 1828 or 1829—but I must have seen it before; but I never said any thing about it till Conrad came up into that country, inquiring for the heirs of Robert Martin. I saw Conrad the next summer at the Sunbury Court. I told him I had a draft of those lands of Robert Martin. He told me to bring it down and show it to him. I went to Philadelphia in 1828 or 1829, and went to old Mr. Rawle and told him I knew of some land belonging to Robert Morris, and if he would make me interested in the matter I would disclose it to him. He said he would, and we agreed upon the terms—I was to have one-half. I then went and gave him a description of the property. I think I showed him that draft. We entered into an article of agreement. He said he would proceed in the matter and bring it to a close. Some time after that

I made another agreement. Nixon would not consent to the revival of the judgment, and the amount of it was, Mr. Nixon became interested, and the judgment was revived and the land sold. William Laird got the half of a tract. He was to have had a whole tract, and Nixon had agreed to it, and then flunked, and we had like to have come to cross-purposes. The lands were sold, and I got one-third, deducting Laird's part, one-third of nineteen-twentieths.

" My father married Robert Martin's daughter. My mother (Deborah Grant) died February 22, 1845. My father died in June, 1815, I think the 15th or 16th of June.

" In 1837, when I came home, I found the original article of agreement between Robert Martin and Robert Morris. I found it in the same trunk with the drafts."

*Cross-examined.*—I delivered that draft to William Rawle, jun., who transacted the business for his father. The first article was with the elder Mr. Rawle. I cannot tell how long after my father's death I first saw it. I was looking over the papers frequently. I must have seen it before 1828—it was in a bundle of drafts. I must have seen it before, or I could not have told Conrad then of it. It was a curious Dutch draft—yellow; knowing that Conrad had shingled it with new warrants, but I did not let Conrad see the endorsement on it. I talked with my mother about it; I do not recollect showing it to her, but I have no doubt I did. She was one of the executors of my father. I do not think I informed any of my uncles of it till shortly before the sale, when I told William Martin of it. If I did not show it to him I told him of it, but I think I showed him it. I think it was in the winter of 1830 that William Martin first became acquainted with it, because I came down then with Mr. Laird to survey the lands. I had the draft with me when we surveyed the land, for I then let Dr. Kugler take a copy of it. The writing at the top—" General draft of esquire Martin's land on the head of the Swatara, Berks county," is in Laird's handwriting. It must have been put on by Laird in 1829 or 1830, for I took it out of his hands in 1830. Shortly before I came to the sale, a man named Dr. Baker wrote to him to come down; then William Martin set up a claim to them. He claimed the lands before the sale, and came down to see Dr. Baker. I found him here when I came here.

I got James Hepburn to draw up the notice at the sheriff's sale, and got my mother to sign it, and got Billy Martin to sign it. It was my object to prevent the lands from being bid up too high. I told Rawle, before and after the sale, of this. Henry Pratt was up

looking at it, but he said he did not want to buy a lawsuit. Joseph Lippencott and some more were looking at them. The new warrant holders gave no notice of their claim of title. The Swatara Coal Company gave no notice. Joshua Martin, and Bankes, and Starr, gave no notice.

Defendants then, under exceptions for the purpose of showing the witness's feelings and bias in favour of plaintiffs, examined him as follows :—

"I represented the Morris title in Mr. Rawle to be good, because I did not know otherwise then ; but in July, 1837, I went to Harrisburg, and then I had a different idea of it. I do not recollect entering a *caveat* against William Rawle. If I did, it has escaped my recollection; I do not think I did; but I did against the new warrant holders. Mr. Levan was at Harrisburg with his counsel examining the title. I was there in the winter of 1837–38. I never examined the offices thoroughly before that time as to these matters, nor while I had the title. I represented the title as good in 1835 or 1836, when I agreed to sell to Richmond. I think I told Wagonseller that the suit would not injure him, as he had purchased the Martin title and had both. I think I never told any one that this suit would only injure Donaldson."

The defendants then produced letters from the witness to W. Rawle, jun., in December 30, 1830, and November 9, 1831. In the former he states, " that the surveys on the new warrants laid on the Schuylkill county lands are patented, except six, against which I have just handed *caveats* to the secretary." In the latter he said, "If the sale should be set aside, I would advise you not to make any compromise with them for any proportion of the land, but to have another sale immediately." He also promised to procure such of the papers from the office as Mr. Parker had not obtained. Also his letter dated November 30, 1830, addressed to Mr. Nixon, in which he states, that he was about to start to survey the ten tracts of land on the Swatara, belonging to the estate of Robert Morris, and requires funds from Rawle and Nixon to pay the expenses. They also produced a *caveat* against granting patents for the lands in question to Levan and Jordan, signed by G. Grant, on behalf of Deborah and Mary Grant, heirs of R. Martin, dated February 26, 1838. The witness recognised these papers, but said he had lost all recollection of the circumstance.

Plaintiffs then showed the original return of Morris under the bankrupt act of 1800. In the schedule annexed, was this entry :—

" Robert Martin : he stands charged on my book with $1245 30,

which is to be balanced by cost and charges of land agreed for. The agreements are among my papers."

They then proved a notice dated 30th June, 1831, signed by William H. Martin, George Grant, and Deborah Grant, of their title to the lands, which was exhibited at the sheriff's sale to Rawle.

The court then permitted plaintiffs to show that Levan, one of the defendants, offered $5000 for the title of Martin's heirs, but refused evidence that a deed was executed by six of the heirs to him, deposited as an *escrow*, and surreptitiously obtained and recorded, without payment of the purchase money.

It appeared from testimony on both sides, that search had been ineffectually made for R. Morris's land-book.

Plaintiffs then gave evidence that Martin was in good circumstances at the time of his death. The court rejected parol evidence that the creditors of Morris had levied on all his property that could be found.

They then called Charles Huston, who stated he had had a pretty extensive practice in land-titles; was well acquainted with the practice of the land-office, and had tested the accuracy of his recollections by recent examination of the books. That when one got the district-surveyor's certificate that the land (warrant) was not satisfied, he took it to the surveyor-general and got a certificate from him, and took it to the receiver-general, and then got a credit for the amount. *That credit was transferred by blank endorsements on the deed poll, the certificate, or the warrant.* Witness produced a number of original vouchers from the land-office, illustrating this practice.

Plaintiffs then showed that these lands had been sold for taxes in 1838, 1840 and 1842, and redeemed.

Defendants then gave in evidence a letter dated November 12, 1836, from William A. Martin to George Grant, in which he stated he had received his letter requesting him to send his deposition respecting the deeds-poll for the land in Schuylkill county; that he recollected going from Lycoming to Northumberland, and getting Col. William Cook's for one, but could not say certainly as to any more. His impression was, Col. Cook's was the last one to be obtained. Also, under exception for improper certificate, a copy of the supersedeas of the commission of Morris's bankruptcy proceedings, certified by the judge of the District Court of the United States, together with the certificate of the clerk under the seal of the court, that the person certifying was the judge, &c.

G. Grant having been recalled, stated he had a conversation with W. A. Martin, who said he recollected going to Cook to get the

deed poll. They then asked, and under exception the court permitted the witness to say whether he and Martin were speaking of the deed to R. Morris. Witness said, I was speaking of the deeds-poll for these lands. I considered the title good under the draft and endorsement. He did say to whom the deed poll was made. It was made in relation to the ten tracts, and that was the last deed poll. This was in 1836 or 1837.

The defendants then gave in evidence the certificate of S. A. Purviance, surveyor-general, signed for him by T. J. Rehrer, under the seal of the office, wherein it appeared, that there had been no returns to the thirty-six warrants applied for in Northumberland county by R. Martin.

The court, (KIDDER, P. J.,) after stating the evidence in chief on both sides, charged the jury,

" The great question is, who paid the purchase money for these lands ? It is claimed by the plaintiffs that Robert Martin paid it, and by the defendants that Robert Morris paid it, and both appeal to the records of the land-office to sustain their allegations.

" As bearing upon this question, it becomes necessary to advert to the situation of the parties at the time of the original transactions, as exhibited in the propositions of Martin to Morris, dated respectively the 27th of February, and 14th of March, 1793, together with the agreement executed by the parties on the 21st of March of the same year, to which we have already adverted. (Here the court read the propositions.) These propositions were admitted in evidence, not as a part of the agreement, for they are legally no part of it, but for the purpose of getting at the situation and intention of the parties at the time of the transaction. They were evidently made during the pendency of a negotiation, which resulted in the formal agreement of the parties on the 21st of March, 1793."

[His honour then stated the substance of the agreement as given above.]

" Now it becomes the duty of the court to put a construction upon this agreement, and, as bearing upon this, the evidence furnished from the land-office becomes important. The books of the land-office show that it was the credit acquired by these unsatisfied warrants that paid the purchase money for the one hundred and fifty-five warrants applied for by Martin. By the terms of this agreement between the parties, these unsatisfied warrants are assigned without reservation to Martin. They became his property, and were placed under his exclusive control. Then ' he, the said Robert Martin, in consideration of the payments aforesaid, and the assignment of the

said warrants,' engages to take up and patent land enough in North-
umberland county to extinguish the advancement, at the rate of
twenty-five cents per acre.    From this it would follow, according to
our construction of the agreement, that Morris did not acquire such
an interest in the land thus taken up as would enable him to pursue
it specifically, but that, in default of Martin's fulfilment of the agree-
ment in question, he would be driven to his personal action for
damages.    The character of the transaction would seem to be in the
nature of a loan from Morris to Martin, to be repaid in land at a
stipulated price.    If there was nothing else in the case, we should
feel bound to say to you, as a matter of law, that the plaintiffs are
entitled to recover.

"But another question arises in this case which interposes greater
difficulty.    The plaintiffs claim as the heirs of Robert Martin, con-
sequently they stand in the same situation as would their ancestor
were he the plaintiff upon this record.    The defendants have given
in evidence a draft of the ten tracts of land in dispute, to which is
attached a memorandum, proved to be in the handwriting of Robert
Martin.

"Now, on the part of the defendants, it is claimed that this is a
declaration on the part of Robert Martin before his death, that the
lands in dispute had been sold to Robert Morris, and that he had
received the purchase money.    This point has been pressed upon
the court by the counsel of the defendants with great force and
power.    The authorities cited bearing upon it, though somewhat
conflicting, would seem to sustain the position, that such a written
declaration, left by a deceased party, furnishes evidence proper for
the consideration of a jury.    This evidence, in connection with the
other facts of the case, should receive the full weight it deserves.
This memorandum must have been made before the death of Robert
Martin.    George Grant thinks he died about the year 1800.    Judge
Huston thinks he died a little earlier.    This draft and memorandum
were found among his papers as late as 1828 or 1829.

"On the part of the plaintiffs, the evidence furnished by this
memorandum on the draft is sought to be resisted.    They allege,
that, if Robert Martin ever had the intention of transferring these
lands in dispute, that this intention was abandoned ; and they claim
that the fact of the non-delivery of this paper to Morris furnishes a
strong presumption that some other arrangement was made between
the parties.    They refer, in the first place, to the schedule accom-
panying the deed of Morris and wife to Biddle and Bell, in trust for
the Pennsylvania Property Company.    This deed bears date the

18th March, 1797. No. 28 of the schedule, we find the following entry:

" ' Fifty-three tracts, containing about twenty-five thousand acres of land in Northumberland county, held by warrant right, bought of Robert Martin as per deed polls,

"'At one dollar, - - - - - - $25,000.'

" The plaintiffs claim that this amounts to a declaration on the part of Robert Morris, that he had received the quantity of land in full stipulated to be conveyed in the agreement of the 21st March, 1793. These are stated to lie in Northumberland county, and this agreement calls for lands there. The lands in dispute are in Schuylkill county, formerly Berks county.

" Connected with this is another item of evidence bearing upon the question at issue, which claims your consideration.

" On the 18th day of July, 1801, Robert Morris applied for the benefit of the bankrupt law, under the act of Congress of 1800. He was required by this law to make a true exhibition, and return to the commissioners under oath, of all his real and personal estate. A schedule of his property was made in due form, and has been produced upon this trial. It is very voluminous, and sets forth very minutely a large amount of real and personal estate.

" In this schedule of property we find this entry:

The court then read the entry.

" It will be recollected that the original indebtedness of Martin to Morris, as set forth in the agreement of the 21st March, 1793, was £2325 19, or equal to $6201 40. It is evident, therefore, that there had been transactions between the parties before the death of Martin, which extinguished his indebtedness to the amount of $4956 10. The book referred to as containing the charges has not been produced, consequently the character of these entries has not been explained. It is said to be lost.

" In this schedule of property returned to the bankrupt commissioners, Mr. Morris attaches a copy of the schedule accompanying his deed to Biddle and Bell, in trust for the Pennsylvania Land Company, and makes it a part of it. Article No. 28 in that schedule becomes, therefore, a part of his returns made under the sanction of an oath. It is claimed, on the part of the plaintiffs, that these transactions of Robert Morris, sanctioned by his oath, and accompanied by the assertion that he had received from Martin fifty-three tracts of land in Northumberland county, embracing about twenty-five thousand acres, is in fact a compliance on the part of Martin with the agreement of the 21st March, 1793. They argue further, that,

from the fact that Morris does not refer to these ten tracts of land as a part of his estate, a strong presumption arises that he did not own them.

" The defendants rely upon the declaration of Robert Martin, proved to be in his handwriting, and attached to the draft of these lands. It therefore becomes a question for your decision. We have at length explained to you the evidence, and we present it to you as a question of fact for your decision. We have presented to you the case, we believe, fairly, and its importance demands at your hands a full and impartial examination. No conveyance of this land, or evidence of it, has been found among the papers of Robert Morris; but it is claimed that this memorandum, in the handwriting of Martin, furnishes evidence that an actual transfer either was or should have been made, together with an admission, that Morris had paid to Martin the purchase money. Many of the papers of Morris are lost and dispersed—the parties have been dead for many years. If alive, there is no doubt but the whole transaction could be satisfactorily explained; but at this distant period of time we are left to grope in the dark, or be guided only by such circumstances as have been rescued from the ravages of time.

" If you find for the plaintiffs, your verdict will be for such an interest in the lands as they claim, a statement of which will be sent out with you. If you find for the defendants, you will render a general verdict in their favour.

" Both plaintiffs and defendants excepted to the charge of the court."

The errors assigned were, 1. In rejecting Grant's deed to Dewart. 2. In admitting the judgment-bond, the execution, and sheriff's sale. 3. The will of Morris and of his wife, and the release to Rawle. 4. The agreement between Nixon, Rawle, and Grant; the mortgage by G. Grant, and the sale, &c., thereunder. 5. The notes by Martin to Morris. 6. The endorsement by Martin on the draft. 7. The deeds from the Martins to William Grant. 8. The evidence that Martin's administrators gave up for sale, under Grant's judgment, the lands in Northumberland county, and the sale, &c., thereunder. 9. The evidence of William Rawle. 10. The assessments. 11. The evidence of George Grant's representations as to title. 12. The rejection of Martin's testimony. 13. The rejection of evidence as to levies by Morris's creditors. 15. In admitting the copy of the supersedeas. 16. George Grant's evidence that they were speaking of the deed to Morris, and in receiving his answer.

17. The certificate of Rehrer. 18. Six errors were assigned to the charge

*W. A. Porter,* for plaintiff in error.—1. The deed from George Grant to Lewis Dewart should have been received. Was Dewart the party *next in interest,* in the sense of the act of 1807? Purdon, 334. Certainly George Grant was not; he had no interest. If Dewart were the devisee of Grant, the point would be clear. 3 Penna. Rep. 426. But the words are broad enough to embrace alienation by deed; why limit them? If properly there, it was necessary Dewart should show his right to the place, and this could be shown only by the admission of the deed. 5. Were the notes from Martin to Morris evidence? The agreement had been offered by the plaintiffs, to explain the delivery of the twenty-five unsatisfied warrants to Martin. It contains internal evidence of a consummation of all previous arrangements. No allegation is made of fraud in its execution, ambiguity in its terms, or mistake in its meaning. It creates no trust. Is there another instance in which the admission of extrinsic evidence, to explain written instruments, is warranted? 1 Dall. 427; 7 Serg. & Rawle, 115; 3 Watts, 243; 16 Serg. & Rawle, 424; 1 Peters' U. S. Rep. 591, (598;) 1 Serg. & Rawle, 464; 10 Serg. & Rawle, 292; 1 Penna. Rep. 417; 6 Serg. & Rawle, 401; 4 Rawle, 130. If the notes accorded with the agreement, they were irrelevant; if they differed from it, may the intentions of the parties not have changed before the execution of the principal paper? For what purpose make the agreement, if their previous acts were to be equally open for construction? 6. The endorsement on the draft is the main point. It was probably made in 1793; was retained by Martin until his death; by his executor for twenty-eight years, and upon the death of the latter was fraudulently removed by one whose interests had then become adverse to the plaintiffs. If possessed of all the attributes of a deed, it was not delivered and can in no way affect the title to land. Co. Litt. 35 b, 49 b; 12 Johns. Rep. 418; 1 Johns. Ca. 114; 3 Hill, 513; 2 Watts, 362; 1 Penna. Rep. 32; 2 Penna. Rep. 310; 5 Watts, 343; 8 Watts, 9. But it is not a conveyance of any thing, nor a covenant to stand seised to uses. 12 Johns. 73; Ib. 355; 1 Preston on Abs. 72, 312; 3 Prest. 21; 1 Dall. 137. Was it such evidence of a sale to Morris as created an equity in the defendants? Upon what terms was the sale made? At best, the contract was executory; "the over measure to be cast up," &c. There was no agreement to satisfy the statute of frauds, and no possession taken. Payment

of the money would have been insufficient. 6 Whart. 153 ; 9 Watts, 85 ; Ib. 109 ; 4 Watts & Serg. 228. Could a chancellor enforce the performance of such an agreement? (1.) There is no mutuality. 1 Watts & Serg. 554. If any, Martin alone was bound, and could have had no remedy. (2.) The terms are absent. How draw a bill in equity from such a paper? 2 Ball & Beaty, 58 ; Ib. 451; Ib. 369; 2 Sch. & Lef. 549 ; 9 Watts, 108 ; Ib. 16. (3.) Chancery will not enjoin in favour of a delinquent equitable owner against the legal holder. 9 Watts, 319 ; 2 Watts, 151. It was not a declaration of trust, nor evidence of a trust, resulting from the alleged payment of the purchase money. But two cases of such a trust can arise, and in these this is not embraced. 2 Watts, 323; 9 Watts, 32 ; 5 Watts, 389 ; 1 Pet. C. C. Rep. 366 ; 2 Wash. C. C. Rep. 397. Was it a declaration made by Martin in opposition to his own interest, and thus evidence against those claiming under him? (1.) The position assumes what is to be established. The declaration never *was* made. Martin and his executor refrained during their lives from making it; and George Grant pretended to no authority to do what they had left undone. All the cases are of words actually spoken, or letters sent. (2.) No proof was given of the loss of the deeds-poll, to warrant its introduction as secondary evidence. Mr. Rawle's search was insufficient. The trunk in Wayne county might have contained them, if in existence. (3.) George Grant's fraud destroyed the paper. After this, sound policy and morality forbade its use in a court. But the effect was lost by lapse of time. 3 Ves, jun. 696, n. ; 4 Ves. 686 ; 5 Ves. 719; 13 Ves. 225 ; 1 Johns. Ch. 370 ; 3 Johns. Ca. 60 ; 4 Johns. Ch. 559 ; 2 Watts, 214; 5 Whart. 584 ; 6 Watts, 396 ; 8 Watts, 374; 5 Serg. & Rawle, 427; 4 Rawle, 38. After a change in the value of the land, a contract to convey will not be enforced. 6 Wheaton, 528 ; 8 Johns. Rep. 257; 13 Johns. Rep. 359; 5 Johns. Ch. Rep. 194; 8 Cranch, 471 ; 9 Cranch, 456. Morris's failure to return the lands in bankruptcy proved it not to have been an existing agreement then.—The court erred in their charge. The construction of the endorsement should not have been left to the jury: the theory of their office supposes them incompetent to that. From such a source great uncertainty must flow. The direction should have been that the plaintiffs had the legal title, and at most the defendants an equity incapable of enforcement, after the lapse of time, and in the absence of the terms of the contract. 9. Mr. Rawle had conveyed the lands to the Jordans and Levan, and had a lien for a part of the purchase money. His testimony was offered, not to the court to form a basis for second-

ary evidence, but to the jury; and the court commented on it in their charge. In this instance, that necessity, which is the test of an interested witness's admissibility, did not exist. Mrs. Nixon, or the representatives of Mr. Davis, could better have testified to the same facts. It was not alleged the papers were lost while in his custody, and the rule admits of no exception that he only, in whose hands a document has been lost, shall be permitted to prove the loss. 1 Greenl. Ev. 396. The reason is plain; he may thus relieve himself from the effects consequent upon wilful suppression. Where the reasons stop, the rule should stop. 10. In receiving the assessments of taxes there was error. Such assessments have been admitted as the foundation of a tax title; for the same reason that a sheriff's deed requires the production of the judgment. From the payment of taxes on unseated lands for twenty-one years, a presumption of ouster has been drawn. 3 Watts, 70; 17 Serg. & Rawle, 350. Assessments have been admitted to show the extent of a claim under the statute of limitations. 10 Watts, 142; 2 Watts & Serg. 240. Here they were offered, not for these purposes, but to prove title. Every reason in the decision that a constable's return of the retailers of foreign merchandise is inadmissible, applies to this point with equal force. 7 Watts, 486; 4 Whart. 365. 15. Should the clerk have certified this record or the judge? If the act of 1790 (1 Story's Laws, 93) be held to apply to state courts, that of 1789, constituting the District Court, must govern. Ib. 54. How can he receive fees for copying, and take the oath, and give bond for preserving the records, if not committed to his custody? Shall the judge certify that of which, from the absence of the records, he must be ignorant? If we are thrown back on the common law, then it was the clerk's duty to keep and to certify the records. 1 Stark. Ev. 189; Jacob's Law Dic., tit. *Prothonotary*, tit. *Clerk of the Assize*; 2 Har. & Johns. 132; 1 Dana, 12; 3 Wash. C. C. Rep. 126; 2 Johns. Ca. 119; 9 Watts, 311. If the proceedings in bankruptcy were not records, a sworn copy was requisite.

*Bannan*, contrà.—1. The suit was more than six years before the conveyance was made, and the act has never been extended to grantees of plaintiffs. McCulloch *v.* Cowher, 5 Watts & Serg. 427. [Rogers, J.—You did not move to strike off, and being on the record, they had a right to show their title.] 5. These papers showed that Martin was unable to purchase lands; had been employed by Morris to discover them; that Morris had advanced the money which

Martin had nevèr accounted for, and the evidencé was to establish a⁻trust, or rebut an equity. [ROGERS, J.—That is immaterial, having been ruled in plaintiffs' favour.] ⸰6. We never pretended the endorsement was a deed, or conveyance of any description whatever; but it was evidence of the fact of a past sale and receipt·of purchase money, creating an equity. There was no evidence of a legal title in Martin; he had at most but the right resulting from the payment of the purchase money to the Commonwealth, and we used this merely as his written admission, that he had parted with that right to us for à valuable consideration. The statute of frauds does not interfere, for the evidence is,in writing, and signed by the party whose heirs are charged. The only fraud was on the heirs of Morris, in requiring a price for the disclosure of this evidence. On the strength of-this, $30,000 has been paid, and expensive improvements made. The meaning of the paper is, that the deeds-poll from the warrantees were to be made to Morris directly. McDonald v. Campbell, 2 Serg. & Rawle, 473. If there be a doubt as to his meaning, that was for the jury. Here was, at all events, a written acknowledgment of a ·past sale of specific lands, and a receipt of the purchase money, which is certainly sufficient to extinguish or pass such a right as Martin had. Bassler v. Niesly, 2 Serg. & Rawle, 352–4; Reed v. Dickey, 1 Watts, 152; Hiester v. Laird, 1 Watts & Serg. 245–8; Packer v. Gonsales, 1 Serg. & Rawle, 526; Gibblehouse v. Stong, 3 Rawle, 437; McDonald v. Adams, 7 Watts & Serg. 371; 3 Wash. C. C: Rep. 369. But it is said the declaration of Morris is, that he received land in Northumberland county. That return in bankruptcy was made from recollection, and referred to papers which he could not inspect; the question was, simply, might he not have been mistaken in the name of the county? We showed he must have been, as the certificate from the land-office showed there were no such lands taken up by Martin. Of the sixty-one tracts applied for there, thirty-six were not returned, and Martin's heirs, in 1816, obtained twenty-five. 9. Mr. Rawle was examined by the court to allow secondary evidence to be given. As to the charge it is plain; if there was any doubt as to the meaning of the paper, and it was to be explained by extrinsic testimony, it was a matter for the jury.

*Greenough.*—If this case was one of fact, the court were right in leaving it to the jury, and of the charge we only could complain. The facts show that Martin's right was an inceptive one merely, from his application for the land, which right he was unable to pursue for want of means, and this he transferred to us. The propositions

show that Martin was under obligations to discover, take up, and convey certain lands, for which Morris had advanced the money, and the Commonwealth received it. The lands not being vacant, the act of 1792 allowed these payments to be used in taking up other land. Under these circumstances, Martin applied to Morris, and they agreed that the. credits of Morris, and some money, should be further advanced to enable Martin to comply with his former con-tract, by which Morris was to have lands in Northumberland county. If appearing beyond a doubt, that Morris never did get the land in Northumberland county, and that the credits advanced under this agreement were applied to the purchase of these particular lands, what interest had Martin? simply a right to the surplus after satisfy-ing his contract with Morris. He never did that, and therefore there was no surplus for him. It will be observed, Martin is nowhere charged with the purchase money; the applications are entered in his name, but Morris's account is debited with the price. That he who pays has the title, is a familiar principle. 8 Watts, 110; 9 Watts, 547. All this we showed merely to add assurance to the admis-sion of a conveyance. As to the declaration of Martin, could it be read? [GIBSON, C. J.—No doubt of that, the question is as to its effect.] The paper was found in the possession of one claiming under Martin, a man of large property, who, during his life, never pretended to any title to the lands. Had we a right to it? To say not, would be to say the parties might have suppressed our evidence because in their possession. What is its manifest object? plainly to prevent an improper claim being set up by mistake. It is like a will, in which he says: 'These lands do not belong to me, for I have transferred my right to Morris, who has paid me for them.' I take the meaning to be this: 'These lands do not belong to me, for I have sold them to Morris who has paid me, and the warrantees have conveyed by deeds-poll to him.' Not that he had conveyed, for he had neither a legal or equitable title. He has paid, that is, to the land-office, and any debt is extinguished. Every requisite of the statute has been complied with; the lands are described by reference, the fact of a sale, which implies a fee, 1 Whart. 425; 8 Watts & Serg. 67; the fact of a receipt of the purchase money, are all in the paper signed by the party. Sugd. Vend. 88. It is not we who are asking equity, it is the plaintiffs, and this is a flat bar—an estoppel. Any admission in writing of the receipt of the purchase money, is sufficient to give us the beneficial interest. Prevost v. Gratz, 1 Pet. C. C. Rep. 366; Stewart v. Brown, 2 Serg. & Rawle, 461.

It is like a declaration of any purchaser as to who paid the money,

or of an attorney, that he paid with his client's money. The deeds-poll must have been made to Morris, for by the agreement the lands were to be patented to him. · Lapse of time is out of the question; the act was *done* before 1804.

The suit against the administrator of Martin was evidence to rebut the implication that Martin' had satisfied his agreement attempted to be raised from Morris's declarations. So of the negative certificate from the land-office.

*J. M. Porter*, in reply.—The main question is, on the admission in evidence of the endorsement upon the draft, and the effect of it if properly admissible. The purchase money in law, and in fact, was paid by Robert Martin. He is charged on the receiver-general's books with the hundred and fifty-five warrants, £1522 10 0, and is credited " by Robert Morris" it is true, because Robert Morris's credit, to that amount, was transferred to him. · This was the only way it could be done according to the rules of book-keeping. Robert Morris is neither charged in day-book, journal, nor ledger, with an acre of land. He is merely charged with the credits he assigned in order to balance the books. The court below were right, therefore, in saying the books of the land-office showed nothing that gave Morris any title to the land taken up by the credits assigned to Martin.

Unsatisfied land warrants were like certificates, bank notes, or any other *choses* that would pay for land. They were matters of daily transfer and sale in those days. They were a sort of currency, that passed from hand to hand. Credits for them were authorized to be applied by the holders, *their heirs and assigns*, to the payment of debts due, or to become due to the Commonwealth for lands, by the act of 29th of March, 1792, (3 Smith's Laws, 63, 64;) the act of 3d. of April, 1792, (3 Smith's Laws, 75,) and the act of 6th of March, 1793, (3 Smith's Laws, 93,) until the system was cut up by the act of 22d of September, 1794, (3 Smith's Laws, 193.) These two last acts authorized the practice up to the 1st January, 1795, when it ceased.

The act of 29th of March, 1792, authorized the transfer of those credits as well for payment of lands already taken up, as for taking out other warrants. By the act of 3d of April, 1792, the holders of unsatisfied warrants might locate them elsewhere than the place described in them. If Robert Morris' had availed himself of this act, he could only take up as many acres as the warrants called for. If he applied them as credits to take out new warrants, he would get

four acres for one; the old warrants being at £10 for a hundred acres; the new warrants at £2 10 0, or fifty shillings. When the amount of these credits was certified by the surveyor-general to the receiver-general, they ceased to be land, and were treated as money.

The charge for land, *in the receiver-general's ledger*, is always in the name of the warrantee, and if one person took out a hundred warrants, each individual in whose name the warrant is taken out, is charged with the amount of land mentioned in the warrant, and credited with whatever is paid on it, no matter by whom the warrant is taken out, or by whom the money is paid. The only way to ascertain who took out the warrant, and who paid the money, is to go to the original application filed, on which the name of the person entering it is entered, and to John Keble's blotter, in which that person is charged with the warrants taken out. In Oliphant *v.* Ferren, 1 Watts, 58, 59, we have a history of this blotter. Warrants themselves as well as applications were assigned informally, and often by parol; Paxton *v.* Price, 1 Yeates, 500; Lynn *v.* Downes, 1 Yeates, 520; *à fortiori* credits to enable one to obtain them. No one ever dreamed of acquiring a title to land, because he sold the warrantee the unsatisfied warrants to pay for them, any more than one who lent another money to take out a warrant.

That payment of the purchase money vests the title without regard to the mere issue of the warrant, is conceded. Keble's blotter showed that Robert Martin *took out* the hundred and fifty-five warrants. The original applications on file are endorsed "Mr. Martin to pay." The blotter shows he applied unsatisfied land warrants to pay £1522 10 0, and fees, "£77 10 0 paid by Squire Martin." It also appears, that from the 20th to 24th of May, 1793, he had these lands surveyed by William Wheeler, deputy-surveyor. At least they were surveyed, and it is neither proved nor pretended that any one else employed Wheeler to do it. Certainly, Robert Morris never did.

The agreement of 21st of March, 1793, puts it beyond question. Morris was not to have *all* the lands taken up by the credits assigned, nor *at the price* at which they were taken up. But *in consideration of the money paid, and unsatisfied warrants assigned*, he was to get "as much good land in Northumberland county as, *at twenty-five cents per acre*, would amount to £2325 10 9. The money paid was £12,000 continental money, advanced in November, 1799, estimated at £561 0 5, and £250 advanced that day in money, and the transfer of twenty-five unsatisfied land warrants amounted to a credit of £1514 10 4, making an aggregate of £2325 10 9. The interest was averaged on the unsatisfied warrants

when the credit was given for £1522 10 0 for them. Here there was an old debt for continental money, to be satisfied by land at 25 cents per acre. The state price was 6d. per acre. So that neither by the facts of the case, by the agreement of 21st of March, 1773, nor by the books of the land-office, had Robert Morris any interest, legal or equitable, in any specific lands.

It is clear, that the ten tracts in dispute, in then Berks, now Schuylkill county, were not contemplated by the parties in the agreement of 21st of March, 1793, which called for lands in Northumberland county. The schedule annexed to the deed to Messrs. Biddle & Bell, shows that the lands in Northumberland county had been furnished, and the deeds-poll delivered. It does not appear that they were not patented. The agreement of 21st of March, 1793, had been given up to Robert Martin, and was found among his papers.

If this memorandum endorsed upon the draft means any thing, it means that there had been *a sale* of these lands. If intended as an acknowledgment that they were included in the original agreement, those terms would not have been used; "belong," or any synonymous term would have been used instead of "sold."

What is this paper? It is said to be evidence of *the conveyance of the whole estate* to Robert Morris, and of a *trust* for him. Admitting the proposition that the declaration of the party is evidence that he has sold, or holds the estate in trust, there is in this case a preliminary question. Is this memorandum a declaration? Communicating a matter to another is an admission to a third person. Stating the fact in a letter and sending a letter to him, to whom it is addressed, is "an uttering and publishing" of the matter. When a man states an account and transmits it to another, it is a written admission made and uttered. But a paper written and retained in the writer's possession is neither uttered nor published. This paper, until exhibited by Robert Martin to some one, was like an unbreathed thought. Hazleton Coal Company v. Megargle, *antè*, 324. In Wilkes's case, the attempt to punish a man for a libel found in his possession and never issued, has been considered a violation of every legal principle. Our argument was and is, "that if the draft of the ten tracts with the endorsement was not delivered by Robert Martin in his lifetime to Robert Morris, it conveyed no title, and was not evidence of any conveyance of title to Robert Morris, or those claiming under him."

If it had been a formal deed, it would pass no title for want of delivery. It cannot be that a paper of this inferior and imperfect

2 M 2

kind shall subserve or effect a purpose which a formal and legal instrument could not. Shall the *inferior* surpass in effect the *superior*?

It is no evidence of a sale, nor do the terms of the alleged sale so appear in it, as to create an estate in equity. Robert Martin had a title to those lands by taking out the warrants, paying for them, and having them surveyed and returned. This was an inceptive title, partly perfected, which needed but the patent to complete it. It needed no deed from the warrantee to obtain this. Martin's estate was *sui generis*, having many of the properties of a legal estate. It would pass by devise or descent. It could be entailed. It was subject to dower, and could be taken in execution for debt. It would sustain an ejectment. It was therefore transmissible as any legal estate, equally affected by the rules of evidence and the statute of frauds. But whatever estate we had, their attempt was to set up an equitable estate in Robert Morris. If we had but an equitable estate we could not sell more. But is this such evidence of a parol agreement to sell as would take the case out of the statute of frauds? The most that can be said of it is, that it means this—" I have agreed to sell these lands to Robert Morris. The deeds-poll from the warrantees are to be made to him. The purchase money to the amount of the warrants has been paid to me—the over-measure to be cast up and accounted for." The reading of this agreement that the deeds-poll *have been made* to Mr. Morris is now for the first time attempted, and is not sustained by any rule of construction. The agreement, if one was made, is not here. There is no proof that it was in writing, and the inference, from the language used, is that it was a verbal agreement. At what price, and on what terms were they sold, and at what price and on what terms was the over-measure to be estimated? If the contract was not in writing, then the payment of the consideration money would not take it out of the statute of frauds as shown in the cases already cited. Nor are the principles settled in these Pennsylvania cases impugned by the authority cited on the other side from Sugden.

But if it were an agreement of any kind, it was executory—something was yet to be done—" the over-measure to be cast up and accounted for." Our estate was at least so far a legal one as to enable us to recover upon it, unless the defendant showed a better estate. In Cook *v.* Trimble, 9 Watts, 16; Peebles *v.* Reading, 8 Serg. & Rawle, 484; Devling *v.* Williamson, 9 Watts, 319; Ong *v.* Campbell, 6 Watts, 396, and Henderson *v.* Hays, 2 Watts, 151, 153, the principle is established that where the defendant claiming under the plaintiff sets up an equitable title, as by

articles of agreement, he becomes the actor—is in the nature of a complainant seeking in equity to enforce the specific execution of a contract, and unless he could in a court of equity obtain a decree for specific performance, he cannot under his alleged agreement defeat the plaintiff's title.

Would a court of equity decree a specific performance of this agreement on our application? A bill for that purpose would not lie against Robert Morris or his heirs, for there would be no evidence against them. It would lie perhaps against the warrantees, to convey to us, but that is not necessary, equity considering that done which ought to be done.

1. Equity never decrees specific performance, unless the contract be clearly made out, and be within the statute of frauds. The complainant must set forth the agreement in his bill, and prove it as stated, 2 Ball & Beatty, 451, 369. Even when it is reduced to writing, equity will not decree the specific execution of a contract, the *terms* of which are doubtful as to their extent. 2 Sch. & Lef. 549. If there be a reasonable doubt about the transaction, the party is left to his remedy at law for non-performance. This agreement is not so made out, as to its nature, terms and extent, to justify a decree, and therefore Robert Morris himself could not have defended against us in ejectment for these lands.

2. But if he once had a remedy, can there be any now by his heirs, or their alienees. Matthews on Pres. Evid. 415, 416, and notes. Equity has uniformly adopted the principles of the statutes of limitations, and the presumptions from lapse of time adopted in analogy to them. If this had been an agreement under seal, it could not have been sued upon or enforced after the lapse of twenty years, without rebutting the presumption arising from lapse of time. 2 Watts, 214, already cited; 2 Story, § 1520, and notes thereto. Specific execution may be resisted on the ground of a waiver by parol, or by acts which produce a presumption of abandonment, delay, change in value, and other circumstances. 6 Watts, 396; 8 Watts, 374, already cited.

The authorities cited on the other side upon the subject of the endorsement, are numerous and familiar, yet they will not justify the admission of this paper as *a declaration*. In Bassler v. Niesly, the court held that the declarations of the father were evidence of the contract between him and his son, *if it were shown, that the son entered into possession under that contract*, thus taking the case out of the operation of the statute. Such is also the decision in principle, in Reed v. Dickey; Hiester v. Laird, and Packer v. Gon-

sales. Gibblehouse *v.* Stong is a case where a man obtained a title, absolute on its face, but declared that the purchase money was paid by another, for whom he was trustee. These declarations were properly admitted in evidence. In the case of McDonald *v.* Campbell, where a man declared he had *sold and conveyed,* it was held that this meant he had conveyed in writing, and that parol evidence of the sale could not be given, without first proving the existence of the deed, and then its loss. There, the declarations were made to third persons; here, they were not made at all; and the endorsement does not say they *were conveyed* to Morris. If it had, defendants failed to prove, *first,* the existence of any deed; *second,* its due execution; *third,* its loss, and *fourth,* its contents. The case of Lee *v.* Parker, 5 Whart. 342, holds, that to give declarations in evidence, the party must show some privity with him to whom they were made, and even then *they would create but an equity.* McDonald *v.* Adams only decides that letters and accounts between the parties might show an equitable title in the defendants. Here, there are no such items of evidence. Gilday *v.* Watson was a case, where a parol sale of an improvement right was sustained, where the purchase money had been paid, and possession delivered in pursuance of it. Willis *v.* Bucher is the case in which the court admitted in evidence a copy of the record of the land-office, showing that the purchase money was paid by A., to whom a patent issued, without producing the patent. James *v.* Gordon is the familiar case of one man using another's name in taking out a warrant.

It is said, we never looked after these lands. There was no evidence of this. They were never taxed to any one until after 1830. Morris or his heirs never looked after them, so that there is nothing to rebut the presumption from lapse of time. Wilson *v.* Clarke, 1 Watts & Serg. 554, is a case bearing upon this alleged agreement, inasmuch as Robert Martin could have no remedy upon it, and it must have been reciprocally binding, or binding on neither.

1. The declaration of Robert Morris in his deed to James Biddle, and William Bell, and the schedule thereto annexed, that he held and conveyed "fifty-three tracts of lands, containing about twenty-five thousand acres in Northumberland county, held by warrant rights *bought* of Robert Martin as per deeds-poll," was evidence that Robert Morris had no title to the lands taken up by the hundred and fifty-five warrants, in virtue of the assignment of the credits, but that he derived title to about twenty-five thousand acres of land *in Northumberland county,* from Martin, in accordance with the agreement between them.

2. That this declaration, coupled with the fact that Morris made no mention of the tracts in dispute in his application for the benefit of the bankrupt law, was strong evidence that Morris had no title or claim of title to the lands in dispute, in virtue either of the agreement of 21st of March, 1793, or of the transfer of the said credits.

3. That if the defendants claimed title to the lands in dispute, under an agreement alleged to have been made by Morris with Martin for the purchase of the same by the former of the latter, they became the actors, and were bound to show, with clearness and precision, what the terms of such agreement were, and that its terms and conditions were complied with by Morris; or they cannot set up such alleged agreement as a defence against the plaintiff's title.

We complain of the judge's charge; that he gave the jury no intelligible instruction about this endorsement, or alleged agreement, or its effect. He said, "it interposes great difficulty," &c. "It is a written declaration furnishing evidence for the consideration of the jury," &c. "Connected with the other facts, it should receive the full weight it deserves." He referred to the argument made by us in relation to it as well as to that of our opponents, but neither as to the construction of the paper, its non-delivery, nor the matter of presumption arising from lapse of time, did the court give any instruction to the jury. In this there was error. Backestoss v. Commonwealth, 8 Watts, 288. This memorandum, the schedule No. 18, the return to the commissioners of bankrupts, and the declaration that all the claim he had against Robert Martin in 1801 was $1245 30, were in writing. On these, and the unexplained lapse of time, the court should have instructed the jury, that they were conclusive that Robert Morris had no title to these lands. The court submitted them as questions for the decision of the jury, without any instructions as to their legal effect. The case presented no evidence on the part of the defendants of any title whatever, and the court should have so charged.

*Jan.* 25. BURNSIDE, J.—The plaintiffs in error were plaintiffs below, and brought this ejectment for four thousand three hundred and sixty-six acres of land, surveyed on ten adjoining warrants in the names of Robert Martin and others, dated the 12th of January, 1793, and surveyed by William Wheeler, deputy-surveyor of Berks county, (now Schuylkill county,) on the 21st, 22d, 23d, and 24th days of May, 1793. The plaintiffs claimed under Robert Martin, and the defendants under Robert Morris. To prove that Robert

Martin was the owner of the warrants and surveys in question, the record shows that Robert Martin had filed applications in the land-office in the months of January, February, and March, 1793, for lands in Northumberland, Luzerne, Berks, and Huntingdon counties, amounting to a hundred and fifty warrants of four hundred acres each. The office received all applications, but issued no warrants until the money was paid to the receiver-general when the warrants issued, bearing the date of the filing of the applications. To raise money to pay the Commonwealth, Martin, on the 21st of March, 1793, entered into an article with Robert Morris, "which recites that Robert Morris did, in the month of November, 1779, pay Col. Martin a sum of £12,000 continental money, equal, with interest, to £561 0 5 specie; and also the said Robert Morris did, in July, 1784, obtain warrants for twenty-five tracts, in the names of divers persons, which, by agreement, the said Martin was to have caused to be surveyed and patented, but which has never been done.

"And whereas, the *said Robert Morris has assigned the above-mentioned warrants to the said Robert Martin*, and hath also this day paid him the sum of £250, specie, he, the said Robert Martin, doth, in consideration of the payment aforesaid, and of *the assignments of the said warrants*, engage that he will, between now and the first day of November next, take up, and cause to be surveyed as much good land *in the county of Northumberland, as, at a quarter of a dollar per acre*, will amount to the sum of £2325 10 9; and the said Robert Martin doth further engage, that he will, at his own proper cost and expense, procure and deliver the said Robert Morris patents for the same." By this agreement, Martin was to give Morris good patented land in Northumberland county, (which then embraced the present counties of Northumberland, Columbia, Union, and parts of Centre and Lycoming,) at a quarter of a dollar per acre. The land in controversy was in Berks county, and not in any application for lands in Northumberland county. The application for the lands in question was for land in Berks, Luzerne, Huntingdon, and Dauphin counties. They further gave in evidence the old purchase blotter of the 27th of May, 1793, No. 10792. This blotter was kept by John Keble; owing to its accuracy and truth, extracts from it, duly certified, are made evidence by legislative enactment; it shows that Colonel Martin paid for

| | | |
|---|---|---|
| 154 lots.   60,500 acres *a* 50s. | | £1512 10 |
| 1 | | 10 00 |
| In all, 155 | Amount, | £1522 10 |

He paid this by the twenty-five warrants which he re-
ceived by the article for Robert Morris's purchase
money, and interest,                                   £1522  19

And that Squire Martin paid the fees, £77 10.

Unsatisfied warrants at this period were received in payment for
new warrants, and passed by endorsement or assignment, under the
provisions of the act of the 29th March, 1792.    They were bought
and sold like bank notes, or any other species of merchandise, by
persons wishing to take up vacant lands.    The agreement between
Morris and Martin is explicit.    Martin owed him an old debt for con-
tinental money.    Morris was to give him the twenty-five unsatisfied
warrants, and to advance him the further sum of £250; and Martin
was to pay the whole debt, and the interest due thereon, in lands, at
25 cents per acre, in Northumberland county.    By their agreement,
Morris had no claim to the lands in Berks county, nor did he claim
them, or mention them in the schedule to his deed to Biddle and Bell
in 1797.    In that schedule he has about twenty-five thousand acres
in Northumberland county, held by warrant-right, bought of Robert
Martin, which he values at $1 per acre.    So in his return on oath to
the commissioners of bankruptcy, under the act of Congress of 1800,
he says nothing about these lands; but returns—"Robert Martin,
he stands charged in my book with $1245 30, which is to be ba-
lanced by cost and charges of land agreed for; the agreements are
among my papers."    It is then clear that the agreements between
the parties has no reference to the lands in question; that Robert
Martin paid the Commonwealth for the lands in dispute.    It is true,
Robert Morris enabled him to pay the state, and that Robert Morris
was to be repaid in lands in Northumberland county, at 25 cents
per acre.

The assignments of error will now be considered in their order.

1. The plaintiffs having given evidence that they were heirs of
Robert Martin, except Lewis Dewart, offered in evidence a deed,
dated the 12th May, 1845, from George Grant to Mr. Dewart.
George Grant was a son of Deborah Grant, who was a daughter of
Robert Martin.    It was proved on the trial she died on the 22d Feb-
ruary, 1845.    This deed was objected to by the counsel of the de-
fendant, and rejected by the court; and this forms the first assign-
ment of error.    Lewis Dewart had been substituted as the plaintiff
in the room of Deborah Grant, deceased, and the jury sworn.    The
deed was offered under the third section of the act of the 13th April,
1807, Dunlap; 201, it provides: "No writ of ejectment shall abate
by reason of the death of any plaintiff or defendant, but the person

or persons next in interest may be substituted in the place of the plaintiff or defendant, who shall have died pending the writ." This act was passed to facilitate the trial of ejectments, and has received a liberal construction. Such was the decision of the court in Darnes *v.* Welsh, 7 Serg. & Rawle, 203, where the widow of the defendant was in possession after the death of her husband. The court granted a rule on her to appear as next in interest; she refused to be made a party, but the court ordered her to be substituted. We all think this act authorizes, where the ancestor dies, pending a writ of ejectment, and the heir aliens, the alienee of the heir may be substituted, when the ancestor has not made provision by will for persons to represent him as next in interest.

The second, third, and fourth errors assigned will be considered together.

2. In admitting in evidence the record of the judgment of Joshua B. Bond *v.* Robert Morris, No. 161, of December Term, 1796, with *scire facias*, the execution, sheriff's sale, and deed.

3. The last will and testament of Robert Morris and Mary Morris, and the release of Henry Nixon and wife, to William Rawle.

4. In admitting the agreement between Henry Nixon, Maria Nixon, William Rawle, by their attorney, William Rawle, jun., and George Grant, in December, 1830. The mortgage of George Grant to John Cowden, and the writ, sheriff's sale, and sheriff's deed thereon.

The defendants were in possession, and claimed under the title of Robert Morris. They had a right to give their title in evidence, and pray the instruction of the court thereon to the jury. It is true, if Robert Morris had no title, and the title to the lands in question were in the plaintiffs, they would not be protected. They only bought all the right, title, and interest that Robert Morris had in the land. We think it best, as a general rule, where persons are in possession of land, to permit them to show what title they claim under, as a title by improvement in opposition to a patent, or a junior warrant in opposition to an elder warrant and survey. The duty of the court arises after the evidence is all received, to give the proper instruction to the jury.

5. This exception is to the error of the court, in admitting in evidence the note in writing, dated 27th February, 1793, purporting to be from Robert Martin, and another note from the same to Robert Morris, as stated in the eighth and ninth bills of exceptions. These notes preceded the article of agreement of the 21st March, 1793. In the first note, of the 27th of February, Mr. Martin proposed to

Mr. Morris, "that he would please to relinquish the contract made in 1784, and let Mr. Martin have the benefit of the old warrants; he will patent as much land at 1 10 per acre as will amount to the principal and interest of the money Mr. Morris has advanced. Mr. Martin hopes, if the above terms should be refused, that Mr. Morris will not suppose Mr. Martin made these proposals with a dishonourable intention, but rather from his embarrassed circumstances."

And the second note on the 14th of March: "If Mr. Morris will pay the purchase money for sixty thousand acres of land in the old purchase, Mr. Martin will patent for him as much land as will amount to the money advanced and the old debt, at 1 $10\frac{1}{2}$ per acre." A week after this, they reduced their agreement to writing, and signed and published it in the presence of witnesses. (What we understand by the old purchase was the land within the purchase of 1754 and 1768, and by the new purchase the lands within the purchase of 1784, lying north of the west branch of the Susquehanna, and west of the Lycoming and Towanda creeks.) This agreement was the contract of the parties. We are unable to see any thing in that agreement inconsistent with these propositions. Both showed that Martin had failed to locate the twenty-five warrants of the 1st July, 1784, (the day the land-office first opened under the Commonwealth.) The legislature had reduced the price of land in the old purchase. The twenty-five warrants had cost £10 per hundred acres; a credit could be had for them in the land-office; principal and interest, and new warrants obtained at 50 shillings per hundred acres. These propositions do not seem to have much bearing on the case. The agreement in pursuance of them is plain, clear, and explicit. The only argument that could be drawn from them was, that Martin said he was poor, and claimed the clemency of Mr. Morris. It was not wrong in the court, in this case, to receive the propositions that preceded the article in evidence. That one of the parties was poor and the other rich affords no reason to change their contract.

6. The sixth error assigned is, that the court erred in admitting in evidence the memorandum purporting to be endorsed on the draft of the lands as follows:—

"These lands sold to Robert Morris, Esq., of Philadelphia. Deed polls to him; purchase money paid me.          ROBERT MARTIN.

"The over measure to be cast up and accounted for."

On a draft of the ten tracts in question, this memorandum was placed by Robert Martin. It was in evidence Robert Martin died in about 1800, and had a paralytic stroke in 1795. George Grant was

called by the plaintiffs, and testified :—" I found this draft among my father's papers in a trunk, (the draft with the endorsement on it, and the trees,) in 1828 or 1829—but I must have seen it before; but I never said any thing about it till Conrad came up into that country, inquiring for the heirs of Robert Martin. I saw Conrad the next summer at the Sunbury court. I told him I had a draft of those lands of Robert Martin. He told me to bring it down and show it to him. I went to Philadelphia in 1828 or 1829, and went to old Mr. Rawle, and told him I knew of some land belonging to Robert Morris, and if he would make me interested in the matter I would disclose it to him. He said he would, and we agreed upon the terms—I was to have one-half. I then went and gave him a description of the property. I think I showed him that draft. We entered into an article of agreement. He said he would proceed in the matter and bring it to a close. Some time after that I made another agreement. Nixon would not consent to the revival of the judgment, and the amount of it was, Mr. Nixon became interested, and the judgment was revived and the land sold. William Laird got the half of a tract. He was to have had a whole tract, and Nixon had agreed to it, and then flunked, and we had like to have come to cross-purposes. The lands were sold, and I got one-third, deducting Laird's part, one-third of nineteen-twentieths.

" My father married Robert Martin's daughter. My mother (Deborah Grant) died February 22, 1845. My father died in June, 1815, I think the 15th or 16th of June.

" In 1837, when I came home, I found the original article of agreement between Robert Martin and Robert Morris. I found it in the same trunk with the drafts."

On cross-examination :—" I delivered the draft to William Rawle, jun., who transacted the business for his father. The first article was with the elder Mr. Rawle. I cannot tell how long after my father's death I first saw it. I was looking over the papers frequently. I must have seen it before 1828—it was in a bundle of drafts. I must have seen it before, or I could not have told Conrad then of it. It was a curious Dutch draft—yellow; knowing that Conrad had shingled it with new warrants, but I did not let Conrad see the endorsement on it. I talked with my mother about it; I do not recollect showing it to her, but I have no doubt I did. She was one of the executors of my father. I do not think I informed any of my uncles of it till shortly before the sale, when I told William Martin of it. If I did not show it to him, I told him of it, but I think I showed him it. I think it was in the winter of 1830 that William

Martin first became acquainted with it, because I came down then with Mr. Laird to survey the lands. I had the draft with me when we surveyed the land, for I then let Dr. Kugler take a copy of it. The writing at the top—' General draft of Esquire Martin's land on the head of the Swatara, Berks county,' is in Laird's handwriting. It must have been put on by Laird in 1829 or 1830, for I took it out of his hands in 1830. Shortly before I came to the sale, a man named Dr. Baker wrote to him to come down; then William Martin set up a claim to them. He claimed the lands before the sale, and came down to see Dr. Baker. I found him here when I came here. I got James Hepburn to draw up the notice at the sheriff's sale, and got my mother to sign it, and got Billy Martin to sign it. It was my object to prevent the lands from being bid up too high. I told Rawle, before and after the sale of this. Henry Pratt was up looking at it, but he said he did not want to buy a lawsuit. Joseph Lippencott and some more were looking at them. The new warrant holders gave no notice of their claim of title. The Swatara Coal Company gave no notice. Joshua Martin, and Bankes, and Starr, gave no notice."

This is the material point of the cause: The effect of this endorsement in the handwriting, and under the signature of Robert Martin, on the draft of the ten tracts in dispute, "These lands sold to Robert Morris, Esq., of Philadelphia. Deeds poll to him; purchase-money paid me. Robert Martin. The over measure to be cast up and accounted for." There is no date, but to judge from the boldness and steadiness of the hand, the endorsement would seem to be made before the writer had become paralyzed, and consequently a considerable time before his death. This memorandum is the defendant's title; and the question is, how is it to operate? As a written agreement for a conveyance from Martin, or for conveyances directly from the warrantees, which it is said equity would execute specifically, the terms of the contract would be sufficiently stated to take it out of the statute of frauds. If the endorsement were a written agreement, that consequence would follow. But an agreement is the assent of two minds to the same thing; it requires that the written evidence of it, when it is reduced to writing, as well as the agreement itself, should be seen and assented to by both parties. It is not merely a secret memorandum made by one of them for his private satisfaction, but it must be the evidence of the bargain appointed by both; just as subscribing witnesses are appointed to attest the execution of the instrument. It may be evidence by a letter sent from the one to the other, and accepted as well as acted upon as an offer of terms, or by

a receipt or memorandum sufficiently stating the conditions; but in these instances the paper is parted with as evidence of the thing agreed to. The principle, that delivery is necessary to give effect to a written agreement, is not confined to specialties. In declaring upon a promissory note, the plaintiff always avers that the maker of it had delivered it; and forms of pleading are the best evidence of the principles of the law.

No one would pretend that a man's undelivered note or bond, found among his papers at his death, could be recovered from his executors, or that a sealed declaration of trust kept by him in his own possession would have any effect; and we cannot see why an unsealed as well as an undelivered memorandum of an agreement should have more. In Plumstead's Appeal, 4 Serg. & Rawle, 545, an envelop containing several securities, and endorsed with the words and letters "For Rebecca Gore," and another "for the heirs of George Plumstead," in the handwriting of the deceased, never having been out of her possession, and without any communication made to any one on the subject, or any evidence to show at what time or for what purpose the endorsements were made; held, not to be of testamentary character. The attempt was, to procure it to be admitted to probate, because it was well known that it could have no effect in any other shape. It could not operate as evidence of a gift, to which delivery of the thing given was necessary to a note or a bond. But the principle of Charlewood v. The Duke of Bedford, 1 Atk. 497, that a writing, to be binding within the statute of frauds, must import the assent to it and *privity* of both the parties to be bound, is still more directly applicable to the case before us; and there it was held, that a mere entry of contracts with tenants on a steward's book is inadmissible as evidence of a contract for a lease. Yet the entry of the steward was the act of the principal; and the decision consequently was, that a private memorandum of an agreement on a man's own book, is not sufficient to take it out of the statute. And why should this private memorandum on the back of a private draft have a greater effect? It was held in Ayliffe v. Tracy, 2 Peere Wms. 65, that the proposal of a marriage portion sent in a letter to a third person is insufficient, unless it was shown to the person who afterwards married the daughter.

It would seem from this, that while the proposal remains in the power of the writer or his friend, it is a private matter; but that when actually shown, it is the same as if the terms were directly proposed to the husband. The endorsement before us, therefore, was not an

agreement " put in writing," according to the words of our statute ; how far is it to have effect, as any thing else ?

The doubt is, whether it ought to have any effect. The utmost that can be allowed to it is that of an admission, that Robert Martin had previously sold the lands to Robert Morris, and that he had received the consideration for them ; but an admission having no more force than a verbal declaration. It is certainly not an admission that he had sold them, and conveyed them by a writing signed by him ; and it is necessary to give the endorsement an effect to that extent, in order to take the case out of the statute. That there was a written conveyance, is a part of it to be established by the defendants, and the burden of proving it lies upon them. But the admission is barely that Martin had sold and received the purchase money : not that he had *conveyed,* which was the operative word in McDonald *v.* Campbell, 2 Serg. & Rawle, 473. On this part of the case, that decision is a decisive authority for the plaintiffs. This interpretation of the endorsement is fortified by the words in it—" deed-polls to him,"—the evident meaning of which is no more than that the deeds-poll were to be made from the nominal owners of the warrants directly to Robert Morris, instead of being made to Robert Martin, in order to be followed by a conveyance from Martin to Morris. That they had not yet been made, is evident from the fact, that some of them were outstanding long after the death of the original parties, and from the memorandum " The over measure to be cast up and accounted for." The endorsement, therefore, imports no more than there had been a verbal sale to Mr. Morris, and it is easy to conceive from the subsequent embarrassment and ruin, why it was not consummated. It is probable that these tracts were intended to be taken in place of an equal number covenanted to be located in Northumberland county ; but it appears, that these parties, who seem to have dealt with each other pretty much upon honour, had changed the terms of their agreement more than once, and it would be dangerous to say they had not done so again. It is probable that Mr. Martin did not comply with his covenant to locate the proper number of tracts in the county specified, or with his verbal agreement to throw in the tracts in dispute to make up the deficiency ; and so far the estate of Mr. Morris may have been prejudiced ; but it is too late to speculate on these matters. After the lapse of half a century, it is now too late to say what would be just between the parties. If the endorsements had indicated that the deeds-poll were already made, a presumption of their loss might have arisen from lapse of time sufficient to justify an assumption that the title had

passed; but it imports no more than the existence, at one time, of a parol agreement executed in part only by payment of the price, which is insufficient to take it out of the statute of frauds. Whether equity would execute it at a period so remote if the statute were out of the way, or presume it to have been abandoned, and the moneys restored, or that the original contract had been satisfied in some other way, it is unnecessary to determine.

It is sufficient for the purposes of the present decision, that the statute of frauds is a flat bar on the ground that the parties neither put the contract in writing, nor executed it in part by delivery of possession in pursuance of it. Whether the defendants are entitled to hold the interest or share of George Grant, was a point not made in the court below, because his conveyance to Dewart was improperly rejected; or in this court: as it was not made or argued here, I am forbidden from giving a binding opinion upon it. I think it well worthy the deliberate consideration of the counsel of the plaintiffs, whether it is possible for either him or his alienee to recover? whether the law does not estop them?

7. In admitting in evidence the deed from Richard Martin and wife, Robert Martin and wife, and other heirs and legal representatives of Robert Martin, to William Grant, as mentioned in the eleventh bill of exceptions.

This deed had no relation to the lands in question; it was for lands in Northumberland county. If the lands conveyed by this deed did not belong to Robert Martin, it conveyed no title. If the lands belonged to Robert Morris, they are still a part of his estate, unless they are lost by the statute of limitations. Suppose these lands did belong to Robert Morris, is that any reason the creditors of Robert Morris should take lands in Berks county of the estate of Robert Martin in execution, and sell them as the estate of Robert Morris? The evidence tends to raise a false and irrelevant issue, calculated to perplex and mislead the jury, and was improperly received.

8. In receiving in evidence the testimony of George Grant relative to Thomas Martin, giving up twenty tracts of land in Northumberland county, to the sheriff of that county, to be levied under the execution of George Grant *v.* The Administrators of Robert Martin; and in admitting the record of that judgment, the execution, sheriff's return, &c.

Nor are we able to discover the relevancy of this evidence. It cannot be pretended, that if Robert Martin, at his decease, had no title to these twenty tracts of land, that the purchaser at sheriff's sale obtained title. If the title to these twenty tracts was in

Robert Morris or in any other person at the time of the levy and sale, that the sale of the lands as a part of the estate of Robert Martin divested that title. Nothing passed by the sheriff's deed, but the right, title, and interest of Robert Martin, deceased, at the time of his death. Where the defendant has no title to the lands sold, the sheriff's sale will not make a title; nothing passes but the right, title, and interest in the land of the defendant in the execution. This evidence ought to have been rejected by the court.

9. The next assignment of error, is in permitting William Rawle to testify to the matters mentioned in the fourteenth bill of exceptions.

It is admitted Mr. Rawle had a claim upon the lands for a balance of purchase money. But it is said by the counsel of the defendant, that he was only examined by the court to lay the foundation for the admission of secondary evidence. The record shows he was examined in chief. No bill of exception lies to evidence received by the court to lay the foundation for the admission of secondary evidence; after the court has received what is deemed a sufficient foundation for the secondary evidence, then a bill of exceptions lies to the secondary evidence; and on that bill of exceptions this court will consider whether sufficient and proper evidence was given to the court to warrant them in admitting the secondary evidence. This court will also judge of the propriety and pertinancy of the secondary evidence to the issue. But we see no reason why the plaintiff's counsel object to the defendants proving that they had searched for deeds-poll among the papers of Robert Morris, and could find none for the lands in question. No person interested in the issue trying is a competent witness in chief.

10. In admitting in evidence the assessments of these lands from 1832 to 1838 to prove the continual claim of the defendants.

It is the universal practice on the trial of ejectments in Pennsylvania, to permit either party to show that they paid the taxes assessed upon the land. The payment of taxes is evidence of claim; but the payment of taxes for five years or longer does not make title. It was not error to receive this offer of the defendants. No question of law was raised by either party on this payment of taxes.

11. In permitting George Grant to testify, in relation to his representations that the title he acquired under Robert Morris was good, and that he was in treaty to sell the same until after his interest was sold, as mentioned in the sixteenth bill of exceptions.

So long as Dewart was a plaintiff on record, and the jury sworn to try his right to the lands claiming under George Grant; his declarations before he conveyed to Dewart were certainly evidence. It was

evidence to them that he was estopped from setting up his after-acquired title, having first induced others to expend their money in acquiring a title under Robert Morris by sheriff's sale, in which title George Grant had an interest. It was not evidence to effect those who had no connection with the sheriff's sale. The act of turpitude of George Grant could only effect those of the plaintiffs who were actors with him.

12. That the court erred in refusing to permit William Martin to testify that (in pursuance of the agreement made by William Levan, one of the defendants with him, to give him $5000 if he would procure the title of the heirs of Robert Martin) he procured deeds to himself from six of the heirs. That he executed a deed to Levan on terms conveying the same to him, which was deposited as an escrow with William A. Lloyd, and to be delivered on the payment of the purchase money. That Levan surreptitiously, and without the payment of the purchase money, and in fraud of the agreement between the parties, obtained the deeds from William A. Lloyd, put them on record, and retained them without ever paying any consideration money as mentioned in the seventeenth bill of exceptions.

The court very properly rejected all this offer, except that William Levan agreed to give $5000, if he would procure the title of the heirs of Robert Martin. This was admitted on the ground that it was notice that the heirs of Robert Martin claimed the land. It was evidence for no other purpose; all the rest of the offer was raising a different issue than the one trying, as we understand the cause. The six heirs of Robert Martin, who had released, were not plaintiffs in this ejectment. Mr. Levan had a right to buy his peace. There was no issue trying between the releasing heirs and the defendants, and how that release was procured, was perfectly immaterial in the the cause trying.

13. This offer also, " to show that the creditors of Robert Morris had levies made on all his property that could be discovered," was properly rejected. It did not tend to elucidate the title to the lands in question on either side.

14. The court were right in rejecting the agreement between William Levan and William A. Lloyd, as mentioned in the nineteenth bill of exceptions. It neither strengthened nor weakened the plaintiff's title. The plaintiffs in this action had no connection with that agreement.

15. The next error assigned is the admitting in evidence what purported to be a copy of the dismissal or *supersedeas* of the commission of bankruptcy in the District Court of the United States, for

the Eastern District of Pennsylvania, as mentioned in the twentieth bill of exceptions.

This question is of small consideration in the case before us, but being pressed on this court, an opinion is indispensable. The certificate of dismissal or *supersedeas* of the proceedings in bankruptcy is certified by the district judge, under his hand and his own private seal, (like a signature to a bond,) and the clerk of the court, under the seal of the court, certifies that he is the judge. The district courts of the United States are courts of record, with exclusive civil and criminal jurisdiction. Every District Court has a clerk, whose duty it is to enter all things judicially done by the judge. 1 Story's Laws U. S. 56. By the act of Congress, 1790, (1 Story's Laws, 67,) all writs from the court bear test of the judge, and are signed by the clerk with the seal of the court. The clerk is the keeper of the records and proceedings of the court. Under the bankrupt law of the 12th of April, 1800, sec. 2, (1 Story's Laws, 733,) the proceedings commenced by petition to the district judge, on which the district judge appointed commissioners. The proceedings were all in the District Court. The act of the 26th May, 1790, provides that the records and judicial proceedings of the state courts shall be proved by the attestation of the clerk, and the seal of the court annexed, if there be a seal, together with the certificate of the judge that the attestation is in due form. Why should not the courts of the United States be held to the same rule Congress has prescribed to the state courts. In this certificate the judge takes the place of the clerk, and the clerk of the judge. As Congress has not prescribed a rule of attestation to their own courts, we must resort to the common law rules. An office-copy of a record is a copy authenticated by a person intrusted for that purpose; it is admitted in evidence upon the credit of the officer, without proof that it has been actually examined. 1 Greenleaf Ev. sec. 507; 2 Phillips, 387; Buller, N. P. 229. We think the clerk is the keeper by law of the proceeding in bankruptcy in the District Court; and is the person to certify to their correctness and verity, under the seal of the court, and the judge to certify that his attestation is in due form.

16. This assignment of error is not supported, nor has it been pressed on the court.

17. The court were right in receiving the certificate of Thomas J. Rehrer. He had certified the copy, with the seal of the surveyor-general's office, and for the surveyor-general. It was not Thomas J. Rehrer's certificate, but the certificate of the proper officer. Such

certificates have been received in evidence in all the courts of the state, since the office was first established by William Penn.

18. Several exceptions were taken to the charge of the court. As the cause on another trial must assume an entire new appearance, we deem it unnecessary to notice the exceptions in detail; this court fully agree with the judge below, that the land-office of Pennsylvania demonstratively shows that the lands in question were entered and paid for by Robert Martin—that the title was in him. This court have given an opinion on the legal effect and operation of the endorsement on the draft so surreptitiously put in circulation. By that endorsement the title of Robert Martin is not divested, and a jury no doubt will be so instructed on another trial.

The judgment is reversed, and a *venire de novo* awarded.